1  B. Kristian W. Rasmussen, III, FL Bar No. 0229430
   LEVIN, PAPANTONIO, THOMAS,
2   MITCHELL, ECHSNER & PROCTOR, P.A.
   316 South Baylen Street, Suite 600 (32502)
3  P. O. Box 12308
   Pensacola, Florida 32591
4  Telephone: (850) 435-7080
   Facsimile: (850) 435-7020
5  Attorneys for Plaintiff

6

7                    UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                      (SAN FRANCISCO DIVISION)

9

10  **In re: Bextra and Celebrex Marketing Sales**    **MDL No. 1699**
   **Practices and Product Liability Litigation**
11                                                   **District Judge: Charles R. Breyer**
                                                     **Magistrate:**
12

13  **DANIEL SILVER**, individually,           CV 07   5704
   **ROBERT HARING**, individually,
14  **LORRAINE LEE**, individually,            **CIVIL COMPLAINT**
   **CANDACE BERRY**, individually,
15  **GUILLERMO SANS**, individually
   **ROBERT ALTADONNA,** individually,
16  **DIANE DICRESCI,** individually,          **JURY TRIAL DEMANDED**
   **CATHY BYRD,** individually,
17  **DWILETTE HAYNES,** individually,

18              Plaintiffs,

19  v.                                         CHAMBERS COPY

20  PFIZER, INC., PHARMACIA CORP., and
   G.D. SEARLE, LLC, (FKA G.D. SEARLE &
21  CO.),

22              Defendants.

23           ABOVE NAMED PLAINTIFFS, individually, as distinct, individual Plaintiffs,

24  pursuant to Pretrial Order 12, by and through counsel and pursuant to applicable law, brings this

25  action against Defendants PFIZER, INC., PHARMACIA CORP., and G.D. SEARLE & CO.

26  (hereafter "Defendants") and alleges as follows:

27

28

   Bextra-MDL                                                    COMPLAINT

I.    **PARTIES**

1.    This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib, trade name BEXTRA® ("Bextra").

2.    Plaintiffs are and were at all relevant times adult resident citizens of the United States, residing at the address in the City, State and County identified in Section IV(A) herein. ("Named Plaintiff's Home District"). The Named Plaintiff's Home District is proper for purposes of remand, transfer, and venue.

3.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York.  In 2003, Pfizer acquired Pharamcia for nearly $60 billion.  At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name Bextra in Named Plaintiff's Home District and nationwide.

4.    Defendant Searle ("Searle") is a Delaware corporation with its principal place of business in Illinois.  At all relevant times, Searle has been engaged in the business of marketing and selling Bextra nationwide and in Named Plaintiff's Home District.  Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

5.    Defendant Pharmacia ("Pharmacia") is a Delaware corporation with its principal place of business in New Jersey.  At all relevant times, Pharmacia, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling Bextra nationwide and in Named Plaintiff's Home District.

II.    **JURISDICTION AND VENUE**

6.    This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

7.    There is complete diversity of citizenship between the Plaintiff and Defendants.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A.

1   § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and

2   because there is complete diversity of citizenship between Plaintiff and Defendants.

3          8.     This action is being filed in the Northern District of California Pursuant to

4   MDL 1699, Pretrial Order No. 2.  However, venue is proper in the Named Plaintiff's Home

5   District pursuant to Pretrial Order 12 and 28 U.S.C.A. § 1391.  Defendants marketed, advertised

6   and distributed the dangerous product in the Named Plaintiff's Home District, thereby receiving

7   substantial financial benefit and profits the dangerous product in the Name Plaintiff's Home

8   District, and reside in the Named Plaintiff's Home District under 28 U.S.C.A. § 1391(c), such that

9   venue is proper.

10          9.     At all relevant times herein, Defendants were in the business of designing,

11  manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and

12  selling their product, Bextra.  Defendants at all times relevant hereto designed, developed,

13  manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce

14  (including Named Plaintiff's Home District) the aforementioned prescription drug.  Defendants

15  do substantial business in the State of Named Plaintiff's Home District, advertise in the district,

16  receive substantial compensation and profits from sales of Bextra in the District, and made

17  material omissions and misrepresentations and breaches of warranties in the District so as to

18  subject them to *in personam* jurisdiction in the District.  In engaging in the conduct alleged herein

19  each defendant acted as the agent for each of the other defendants, or those defendant's

20  predecessors in interest.

21  **III.   INTERDISTRICT ASSIGNMENT**

22          10.    Assignment to the San Francisco Division is proper as this action is related

23  to *In Re: Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to

24  the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,

25  2005.

26

27

28

IV.    **FACTUAL BACKGROUND**

A.    **Facts Regarding Plaintiff**

11.    Plaintiff DANIEL SILVER is an adult resident citizen of Florida, residing at 6037 Balboa Circle, Boca Raton, FL 33433. For purposes of remand, transfer and venue, this is in the Southern District of Florida. Plaintiff was prescribed, and began taking, Bextra on or about January 29, 2003. As a direct and proximate result of using Bextra, Plaintiff suffered severe cardiovascular injuries. Specifically, on or about March 1, 2004, Plaintiff suffered a heart attack, which caused Plaintiff's damages and injuries set forth herein.

12.    Plaintiff ROBERT HARING is an adult resident citizen of Florida, residing at 5171 Goshawk Drive, Milton, FL 32570 in Santa Rosa County. For purposes of remand, transfer and venue, this is in the Northern District of Florida. Plaintiff was prescribed, and began taking, Bextra on or about November 11, 2002. As a direct and proximate result of using Bextra, Plaintiff suffered severe cardiovascular injuries. Specifically, on or about March 15, 2004, Plaintiff suffered a stroke, which caused Plaintiff's damages and injuries set forth herein.

13.    Plaintiff LORRAINE LEE is an adult resident citizen of Florida, residing at 1510 West Ariana, Lot 432, Lakeland, FL 33803. For purposes of remand, transfer and venue, this is in the Middle District of Florida. Plaintiff was prescribed, and began taking, Bextra on or about September 9, 2002. As a direct and proximate result of using Bextra, Plaintiff suffered severe cardiovascular injuries. Specifically, on or about June 5, 2004, Plaintiff suffered a heart attack, which caused Plaintiff's damages and injuries set forth herein.

14.    Plaintiff CANDACE BERRY is an adult resident citizen of South Carolina, residing at 174 Berry Hill Lane, Gaston, SC 29053. For purposes of remand, transfer and venue, this is in the District of South Carolina. Plaintiff was prescribed, and began taking, Bextra on or about December 10, 2002. As a direct and proximate result of using Bextra, Plaintiff suffered severe cardiovascular injuries. Specifically, on or about May 21, 2003, Plaintiff suffered a heart attack, which caused Plaintiff's damages and injuries set forth herein.

15.    Plaintiff GUILLERNO SANS is an adult resident citizen of Florida, residing at 16280 Trafalgar Drive, Loxahatchee, FL 33470. For purposes of remand, transfer and

1   venue, this is in the Southern District of Florida. Plaintiff was prescribed, and began taking,

2   Bextra on or about March 5, 2003. As a direct and proximate result of using Bextra, Plaintiff

3   suffered severe cardiovascular injuries. Specifically, during January and/or February, 2004

4   Plaintiff suffered angina and various other cardiovascular injuries on or about the following dates:

5   August 4, 2004, October 16, 2004, and March 23, 2005, which caused Plaintiff's damages and

6   injuries set forth herein.

7         16.    Plaintiff ROBERT ALTADONNA is an adult resident citizen of Florida,

8   residing at 1120 Boxwood Drive, No. 204, Delray Beach, FL 33445. For purposes of remand,

9   transfer and venue, this is in the Southern District of Florida. Plaintiff was prescribed, and began

10  taking, Bextra on or about December 22, 2002. As a direct and proximate result of using Bextra,

11  Plaintiff suffered severe cardiovascular injuries. Specifically, January 2004 and/or on or about

12  February 3, 2004 and/or on or about February 24, 2004, Plaintiff suffered a stroke, which caused

13  Plaintiff's damages and injuries set forth herein.

14        17.    Plaintiff DIANE DICRESCI is an adult resident citizen of Florida, residing

15  at 420 Seaside Lane, Juno Beach, FL 33408. For purposes of remand, transfer and venue, this is

16  in the Southern District of Florida. Plaintiff was prescribed, and began taking, Bextra on or about

17  May 1, 2003. As a direct and proximate result of using Bextra, Plaintiff suffered severe

18  cardiovascular injuries. Specifically, on or about May 30, 2004, Plaintiff suffered a stroke, which

19  caused Plaintiff's damages and injuries set forth herein.

20        18.    Plaintiff CATHY BYRD is an adult resident citizen of Arkansas, residing

21  at 2409 Zion Road, Fayetteville, AR 72703. For purposes of remand, transfer and venue, this is

22  in theWestern District of Arkansas. Plaintiff was prescribed, and began taking, Bextra on or

23  about the month of October, 2002. As a direct and proximate result of using Bextra, Plaintiff

24  suffered severe cardiovascular injuries. Specifically, on or about one and/or several of the

25  following dates February 17, 2003, the month of February 2005 and/or September 2006, Plaintiff

26  suffered a heart attack, which caused Plaintiff's damages and injuries set forth herein.

27        19.    Plaintiff DWILETTE HAYNES is an adult resident citizen of Mississippi,

28  residing at P.O. Box 52, Lyon, MS 38645 in Coahoma County. For purposes of remand, transfer

1   and venue, this is in the Northern District of Mississippi.  Plaintiff was prescribed, and began

2   taking, Bextra on or before October 14, 2002.  As a direct and proximate result of using Bextra,

3   Plaintiff suffered severe cardiovascular injuries.  Specifically, on or about the month of May,

4   2004, Plaintiff suffered a stroke, which caused Plaintiff's damages and injuries set forth herein.

5          20.     Unaware of the risks presented by Bextra, or that Bextra was the cause of

6   their respective injuries, Plaintiff continued to take Bextra.

7          21.     Plaintiff and Plaintiff's healthcare providers were at the time of Plaintiff's

8   adverse cardiovascular event unaware—and could not have reasonably known or have learned

9   through reasonable diligence—that such injury directly resulted from Defendants' negligence and

10  otherwise culpable acts, omissions, and misrepresentations or from Plaintiff's ingestion of Bextra.

11         22.     Plaintiff used Bextra in a proper and reasonably foreseeable manner and

12  used it in a condition that was substantially the same as the condition in which it was

13  manufactured and sold.

14         23.     Plaintiff would not have used Bextra had Defendants properly disclosed the

15  risks associated with the drug.

16                         **Estate Claim Pleadings and Damages**

17         24.     As a result of Defendants' actions, Plaintiff, Decedent, and the Decedent's

18  prescribing physicians were unaware, and could not have reasonably known or have learned

19  through reasonable diligence, that the Plaintiff and/or Decedent had been exposed to the risks

20  identified in this complaint, and that those risks were the direct and proximate result of

21  Defendants' acts, omissions, and misrepresentations.  Decedent died, leaving survivors as defined

22  by law who incurred the following damages:

23                 a.      Decedent sustained serious cardiovascular injuries and death.

24  Decedent required healthcare and services incurring direct medical losses and costs including care

25  for hospitalization, physician care, monitoring, treatment, medications, and supplies.

26                 b.      Plaintiff, as the surviving spouse of Decedent, suffered a loss of

27  support and services and endured mental pain and suffering and loss of consortium.  The losses

28  are permanent and continuing in nature.

Bextra-MDL                          - 6 -                          COMPLAINT

1            c.      The surviving children of Decedent suffered a loss of support and

2    services and endured mental pain and suffering and loss of consortium of their parent. The losses

3    are permanent and continuing in nature.

4            d.      In addition, the Estate of the Decedent suffered a loss of net

5    accumulations due to the premature death of Decedent, and the personal representative incurred

6    medical and funeral expenses for the burial and funeral services of the deceased.

7            e.      Defendants' conduct as described above was committed with

8    knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the

9    rights and safety of consumers such as Decedent, thereby entitling Plaintiff to punitive damages

10   so as to punish Defendant and deter it from similar conduct in the future.

11           25. WHEREFORE, Plaintiff demands judgment against Defendants and seeks

12           compensatory damages, and exemplary and punitive damages together with

13           interest, the costs of suit and attorneys' fees and such other and further

14           relief as this Court deems just and proper.

15   **B.**    **Facts Regarding Bextra**

16           26.      Bextra is one of a class of pain medications called non-steroidal anti-

17   inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade

18   name Advil) are examples of well-known NSAIDs.

19           27.      NSAIDs reduce pain by blocking the body's production of pain

20   transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX

21   enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and

22   COX-2 enzymes.

23           28.      In addition to decreasing inflammation, the prostaglandins that are

24   supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the

25   stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the

26   medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue

27   is hampered and as a result, can cause harmful gastrointestinal side effects, including stomach

28   ulceration and bleeding. Prostaglandin I2 is the predominant cyclooxygenase product in

Bextra-MDL             - 7 -             COMPLAINT

1  endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and
2  preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit
3  Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected.
4  Thromboxane A2 is a potent platelet aggregator and vasoconstrictor which is synthesized by
5  platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction,
6  the COX-2 inhibitors support it. Traditional NSAIDs like aspirin reduce pain/inflammation and
7  therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be
8  expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do
9  not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

10          29.     Defendants and other pharmaceutical companies set out to remedy these
11  ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors
12  that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of
13  gastric tissue while still reducing inflammation.

14          *30.*    In making this decision, Defendants and their predecessors in interest either
15  intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2
16  inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood
17  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,
18  unstable angina. The vasoconstriction and fluid retention cause the hypertension.

19          31.     The defendants launched Celebrex, the first of the three major COX-2
20  inhibitor drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and
21  consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In
22  May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

23          32.     Seeking increased market share in this extremely lucrative market,
24  Defendants, and their predecessors in interest, also sought approval of a "second generation"
25  selective COX-2 inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the
26  (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief
27  of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

28

1    33.    The FDA granted approval of the new drug on November 16, 2001, for two
2    particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms
3    of osteoarthritis and rheumatoid arthritis.

4    34.    The FDA did not grant approval to market and promote Bextra for the
5    management or prevention of acute pain.

6    35.    The FDA did not grant approval to promote Bextra as more effective than
7    other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or
8    gastric bleeding.

9    36.    Even without a label that allowed Defendants to legitimately claim superior
10   safety, when Defendants, and their predecessors-in-interest, began marketing Bextra in early 2002,
11   Defendants and their representatives and agents misrepresented the safety profile of Bextra to
12   consumers, the medical community, healthcare providers, and third party payors. Defendants
13   proceeded to promote, market, sell, and distribute Bextra as a much safer and more effective pain
14   reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

15       **C.    Facts Regarding Bextra's Safety**

16   37.    The potential for cardiovascular risk of selective COX-2 inhibitors was
17   known to Defendants long before the FDA granted market approval for Bextra. By 1997, and
18   prior to the submission of the New Drug Application (the "NDA") for Bextra, Defendants were
19   aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacylcin
20   synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing
21   blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular*
22   *Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954. Although all
23   COX-2 inhibitors have this mechanism of action, Bextra was the most selective COX-2 inhibitor
24   proposed for approval. Accordingly, it had the greatest potential to cause adverse cardiovascular
25   and cerebrovascular events.

26   38.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of
27   Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on
28   October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as

Bextra-MDL                              - 9 -                                    COMPLAINT

1   Bextra, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet

2   aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

3           39.    Nevertheless, the Defendants submitted an NDA to the FDA for Bextra,

4   omitting information about the extent of the risks associated with Bextra.  Without a complete

5   picture of the potential hazards associated with the drug, the FDA approved Bextra on or about

6   November 16, 2001.

7           40.    Based on the studies performed on Bextra, other COX-2 inhibitors, and

8   basic research on this type of selective inhibitor which had been widely conducted, Defendants

9   knew when Bextra was being developed and tested that selective COX-2 inhibitors posed serious

10  cardiovascular risks for anyone who took them, and presented a specific additional threat to

11  anyone with existing heart disease or cardiovascular risk factors.

12          41.    Studies show that selective COX-2 inhibitors, including Bextra, decrease

13  blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting,

14  high blood pressure, heart attack, and stroke.

15          42.    The defendants marketed Bextra in the United States for three years (April,

16  2002 – April 7, 2004).  During that time the FDA forced the defendants to strengthen the warning

17  label several times.  The enhanced warnings followed in the wake of the results of additional

18  cardiovascular studies performed by Defendants, as well as numerous complaints to the FDA

19  regarding various adverse events.

20          43.    Prior to strengthening the warning for Bextra, Defendants had knowledge

21  of the coronary and cardiovascular safety risks of Bextra from several studies.  *See e.g.*, Otto,

22  E.O., *Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in*

23  *Patients Undergoing Coronary Artery Bypass Surgery*, *The Journal of Thoracic and*

24  *Cardiovascular Surgery*, June 2003 at 1481.

25          44.    Even Defendants' own (and Pfizer funded) post- drug approval meta-

26  analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data

27  showing an increased cardiovascular risk in patients treated with Bextra after undergoing

28  coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood

1  clots in the legs and lungs.  The results were particularly relevant and striking as each of the study

2  participants who was a post-bypass surgery patient was taking anti-clotting agents at the time

3  their exposure to Bextra was being tracked.

4       45.    In mid-January 2005, a peer-reviewed paper from the University of

5  Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the

6  intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a

7  heart attack or stroke.

8       46.    Despite years of studies on selective COX-2 inhibitors, as well as the

9  disturbing new studies specifically analyzing the risks of Bextra, Defendants failed to take any

10  action to protect the health and welfare of patients, but instead, continued to promote the drug for

11  sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis

12  Drug Advisory Committee meetings.

13       47.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily

14  withdraw" Bextra from the U.S. market, stating:

15       . . . the Agency has concluded that the overall risk versus benefit
16       profile of Bextra is unfavorable.  This conclusion is based on the
     potential increased risk for serious cardiovascular (CV) adverse
17       events, which appears to be a class effect of non-steroidal anti-
     inflammatory drugs (NSAIDs) (excluding aspirin) … and the fact
18       that Bextra has not been shown to offer any unique advantage over
     the other available NSAIDs. (FDA Alert for Healthcare
19       Professionals, April 7, 2005.)

     48.    Continuing, the FDA noted:
20

21       Bextra has been demonstrated to be associated with an increased
     risk of serious adverse CV events in two short-term trials in patients
22       immediately post-operative from coronary artery bypass graft
     (CABG) surgery . . . .  FDA has concluded that it is reasonable to
23       extrapolate the adverse CV risk information for Bextra from the
     short-term CABG trials to chronic use given the fact that other
24       COX-2 selective NSAIDs have been shown in long-term controlled
     clinical trials to be associated with an increased risk of serious
25       adverse CV events (e.g., death, MI, stroke), and the well described
     risk of serious, and often life-threatening gastrointestinal
26       bleeding . . . .  To date, there have been no studies that demonstrate
     an advantage of Bextra over other NSAIDs that might offset the
27       concern about the serous skin risks, such as studies that show a GI
     safety benefit, better efficacy compared to other products, or
28       efficacy in a setting of patients who are refractory to treatment with
     other products."

49.     Dr. Garret A. Fitzgerald, cardiologist and pharmacologist at the University of Pennsylvania, presented the preliminary results of his Bextra study at the American Heart Association meeting in New Orleans, Louisiana. His study, containing 12 trials including 5,930 patients, found 2.19 times the number of strokes among patients given Bextra. *Named Plaintiff's Home District Times*, Nov. 10, 2004.

50.     Instead of studying Bextra prior to its market launch, the Defendants simply relied upon data and information gathered from Celebrex trials and studies. The Celebrex data put Pfizer on notice that Cox-2 NSAIDs are, at the very least, associated with a disproportionately increased number of adverse cardiovascular events. Taking the results from the Celebrex trials in conjunction with the available medical literature; the Defendants knew about the increased incidence and association between Bextra and the potentially life-threatening dangers it could cause.

51.     The Named Plaintiff's Home District Times uncovered the truth about the inadequate studies by interviewing Pfizer researcher Dr. Feczko - Pfizer's president for worldwide development.

> Over all, Pfizer has performed much less research on Bextra than on Celebrex, Dr. Feczko said. Most of the company's studies of Bextra have been short term, with many lasting only two weeks. As a result, Pfizer has less data to support its contention that Bextra is safe , he said.
>
> ***
>
> Dr. Feczko of Pfizer explained that the company felt it was not as important to study Bextra extensively because the company believed that the drug was similar to Celebrex.

*The Named Plaintiff's Home District Times*, February 5, 2005.

52.     The Celebrex data relied upon by the Defendants was not adequate. On July 23, 2005, the New England Journal of Medicine published the results of its investigative research noting: "Most data on the cardiovascular risks associated with celecoxib have come from observational studies or short-term randomized trials." N. ENG. J. MED. 352;25 at 2649.

53.     On December 23, 2004, three (3) researchers from the well-respected

1    Vanderbilt University published an article in the New England Journal of Medicine. The doctors

2    wrote: "To protect the safety of the public, we write to recommend that clinicians stop prescribing

3    Valdecoxib (Bextra) except in extraordinary circumstances." N. ENG. J. MED. 351;26. The

4    authors cite to two (2) recent studies "which showed a 3-fold increase in serious cardiovascular

5    injuries in patients receiving Valdecoxib after coronary-artery bypass grafting." Later, on

6    February 17, 2005, the New England Journal of Medicine published the results of a study

7    conducted by eight (8) doctors with similarly alarming results. N. ENG. J. MED. 2005;352.

8        54.    In January 2005, Drs. Fitzgerald, Furberg and Psaty published an editorial

9    in *Circulation*, the official journal of the American Heart Association. This editorial was based

10    on a meta-analysis of two (2) clinical studies, and discusses the association between intravenous

11    administration of an identical drug, and oral administration of Bextra. All three doctors found a

12    "3-fold higher risk of cardiovascular injuries with the drug than with a placebo." *Cir.* 2005;

13    111:249.

14        55.    The scientific data available during and after Bextra's approval process

15    made clear to Defendants that their formulation of Bextra would cause a higher risk of blood

16    clots, stroke and/or myocardial infarctions among Bextra consumers, alerting them to the need to

17    do additional and adequate safety studies.

18        56.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal

19    of Medicine*, outlining Defendants' failure to have conducted the necessary trials before

20    marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular

21    risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with

22    established coronary artery disease, who frequently have coexisting osteoarthritis requiring

23    medication and have the highest risk of further cardiovascular events."

24        57.    Dr. Topol was also the author on the study published in August 2001 in

25    JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in

26    persons who used COX-2 inhibitors.

27        58.    Based upon readily available scientific data, Defendants knew, or should

28    have known, that their pre-approval testing of Bextra did not adequately represent the cross-

1  section of individuals who were intended consumers and therefore, likely to take Bextra.

2  Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for

3  Bextra (noting that: "Platelets: In four clinical studies with young and elderly ($\geq$ 65 years)

4  subjects, single and multiple doses up to 7 day mg BID had not effect on platelet aggregation").

5          59.     Had Defendants done adequate testing prior to approval and "market

6  launch," rather than the extremely short duration studies done on the small size patient base that

7  was actually done) Pharmacia and Searle's scientific data would have revealed significant

8  increases in incidence of strokes and myocardial infarctions among the intended and targeted

9  population of Bextra consumers. Adequate testing would have shown that Bextra possessed

10 serious side effects. Defendants should have taken appropriate measures to ensure that their

11 defectively designed product would not be placed in the stream of commerce and/or should have

12 provided full and proper warnings accurately and fully reflecting the scope and severity of

13 symptoms of those side effects should have been made.

14         60.     In fact, post-market approval data did reveal increased risks of clotting,

15 stroke and myocardial infarction, but Defendants intentionally suppressed this information in

16 order for them to gain significant profits from continued Bextra sales.

17         61.     Defendants' failure to conduct adequate testing and/or additional testing

18 prior to "market launch" was based upon their desire to generate maximum financial gains for

19 themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

20 inhibitor market. At the time Defendants manufactured, advertising, and distributed Bextra to

21 consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding

22 the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants

23 knew that if such increased risks were disclosed, consumers would not purchase Bextra, but

24 instead would purchase other cheaper and safer NSAIDs.

25     **D.    Facts Regarding Defendants' Marketing and Sale of Bextra**

26         62.     The defendants rushed Bextra to the market in an effort to regain Cox-2

27 market share. In response to the introduction of Vioxx, and without performing adequate

28 research, the Defendants hastily introduced their own more selective Cox-2 inhibitor, Bextra, to

1    the market.  In doing so, Pfizer, admittedly, relied upon problematic research results from its

2    study of Celebrex.

3    63.    Pfizer stuck to its original plan – focus on marketing and avoid studying

4    Bextra.  Thus, it was reported: "The positioning for Bextra began more than a year and a half

5    before it hit the market.  Pharmacia conducted research about the arthritis market to examine gaps

6    in treatment, said Sylvia McBrinn, Pharmacia's Vice President for global marketing for Bextra."[1]

7    Bextra's marketing research was conducted over a year and a half, while science took a backseat,

8    with one small study for Bextra lasting not even one year and the rest lasting only weeks in

9    duration.

10    64.    At all times relevant herein, Defendants engaged in a marketing campaign

11    with the intent that consumers would perceive Bextra as a safer and better drug than its other

12    NSAIDs and, therefore, purchase Bextra.

13    65.    Such an ineffective and unreasonably dangerous drug could only be widely

14    prescribed as a result of a tremendous marketing campaign.  In addition to being aggressive, the

15    Defendants' marketing campaign was fraudulent and misleading.  But for fraudulent and

16    misleading advertising, consumers would not have purchased Bextra, a more costly prescriptive

17    drug, that was not effective for its intended purposes.

18    66.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its

19    promotional activities.  The reprimand reads: "These five promotional pieces [3 Celebrex and 2

20    Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority,

21    and unsubstantiated effectiveness claims."  This was not the Defendants first offense related to its

22    Cox-2 inhibitors.  The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has

23    reviewed these promotional pieces and has determined that they are false or misleading because

24    they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile,

25    and are lacking in fair balance."

26    67.    Bextra was never approved for the treatment of acute pain. Without such

27    approval, Pfizer was prohibited from marketing Bextra for such an indication.  Nevertheless, in

28
_____
[1] *New Jersey Record*, North Jersey Media Group, Inc., April 14, 2002.

1   May of 2002, Pfizer issued a press release announcing the publication of a study in the Journal of
2   the American Dental Ass'n (JADA) concluding that Bextra is effective in the treatment of acute
3   pain associated with dental surgery. Interestingly, the dental study was sponsored by the
4   defendants and three of the five authors were employees of Pharmacia.

5       68.     Essentially, Pfizer was attempting to circumvent the FDA by promoting a
6   study it funded and authored for an unapproved use. Once the results were published, Pfizer's
7   aggressive promotional campaign continued. Pfizer issued a press release touting Bextra's
8   efficacy for the treatment of acute pain. After the press release, Dr. Steve Geis, Group Vice
9   President of Clinical Research was reported to have said the following: "Post-surgical pain can be
10  under-managed and cause patients tremendous discomfort. ... This investigational study suggests
11  that Bextra may offer promise in acute pain management and further study is required."[2]

12      69.     Defendants widely and successfully marketed Bextra throughout the
13  United States by, among other things, conducting promotional campaigns that misrepresented the
14  efficacy of Bextra in order to induce a widespread use and consumption. Bextra was represented
15  to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made
16  misrepresentations by means of media advertisements, and statements contained in sales literature
17  provided to Plaintiff's prescribing physicians.

18      70.     Despite knowledge of the dangers presented by Bextra, Defendants and
19  Defendants' predecessors in interest, through their officers, directors and managing agents for the
20  purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy
21  the known defects of Defendants' product, Bextra, and failed to warn the public, including
22  Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product,
23  Bextra. Defendants and their officers, agents and managers intentionally proceeded with the
24  inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,
25  Bextra, knowing that persons would be exposed to serious potential danger, in order to advance
26  their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a
27  conscious disregard for the safety of the public and particularly of Plaintiff.

28
---
[2] Press Release: docguide.com March 25, 2002.

1             71.     In an elaborate and sophisticated manner, Defendants aggressively

2 marketed Bextra directly to consumers and medical professionals (including physicians and

3 leading medical scholars) in order to leverage pressure on third party payors, medical care

4 organizations, and large institutional buyers (*e.g.*, hospitals) to include Bextra on their

5 formularies. Faced with the increased demand for the drug by consumers and health care

6 professionals that resulted from Defendants' successful advertising and marketing blitz, third

7 party payors were compelled to add Bextra to their formularies. Defendants' marketing campaign

8 specifically targeted third party payors, physicians, and consumers, and was designed to convince

9 them of both the therapeutic and economic value of Bextra.

10          72.     Defendants represented that Bextra was similar to ibuprofen and naproxen

11 but was superior because it lacked any of the common gastrointestinal adverse side effects

12 associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance,

13 NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with

14 long-term use. Defendants promoted Bextra as a safe and effective alternative that would not

15 have the same deleterious and painful impact on the gut, but that would be just as effective, if not

16 more so, for pain relief.

17          73.     Bextra possessed dangerous and concealed or undisclosed side effects,

18 including the increased risk of serious cardiovascular events, such as heart attacks, unstable

19 angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as

20 strokes. In addition, Bextra was no more effective than traditional and less expensive NSAIDs

21 and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal

22 bleeding. Defendants chose not to warn about these risks and dangers.

23          74.     Defendants knew of these risks before the U.S. Food and Drug

24 Administration (the "FDA") approved Bextra for sale on November 16, 2001, but Defendants

25 ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied

26 inefficacy in its promotion, advertising, marketing, and sale of Bextra. Defendants' omission,

27 suppression, and concealment of this important information enabled Bextra to be sold to, and

28 purchased, or paid for by, the Consumers at a grossly inflated price.

75.    Consequently, Bextra captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2004 alone sales of Bextra exceeded $1 billion, despite the significantly higher cost of Bextra as compared to other pain relievers in the same family of drugs.

76.    Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Bextra as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Bextra, Defendants were able to justify pricing Bextra significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth about Bextra, Defendants would not and could not have reaped the billions of dollars in Bextra sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

77.    Instead of revealing the risks of Bextra, Defendants intentionally downplayed the risks from Bextra in news releases when Bextra's safety was challenged for the first time in the mainstream media. *See e.g.*, Nov. 10, 2004 <u>Pfizer News Release</u> ("Pfizer Inc. said a Named Plaintiff's Home District Times article published today draws unsubstantiated conclusions about the cardiovascular safety of its Cox-2 medicine Bextra . . ."). Defendants similarly had earlier downplayed the risks in communicating to healthcare providers misleadingly stating that "available clinical information for Bextra suggests there is no increased risk of cardiovascular thromboembolic events in people treated for osteoarthritis (OA) and rheumatoid arthritis (RA)" Oct. 15, 2004 *Pfizer News Release*. Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Bextra from Plaintiff, the public, the medical community, and the regulators. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Bextra, and prevented Plaintiff from obtaining all the material information that would be important to their decisions as reasonable persons to purchase, pay for, and/or use Bextra.

1          78.     Defendants' systematic, active, knowing, deliberate, and uniform

2  concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or

3  use Bextra; and caused Plaintiff's losses and damages as asserted herein.

4          79.     Had Defendants done adequate testing prior to approval and "market

5  launch," Pharmacia's scientific data would have revealed significant increases in stroke and

6  myocardial infarction amongst the intended population of Bextra consumers. Adequate testing

7  would have shown that Bextra possessed serious side effects. Defendants should have taken

8  appropriate measures to ensure that their defectively designed product would not be placed in the

9  stream of commerce and/or should have provided full and proper warnings accurately and fully

10  reflecting the scope and severity of symptoms of those side effects should have been made.

11          80.     In fact, post-market approval data did reveal increased risks of clotting,

12  stroke and myocardial infarction, but this information was intentionally suppressed by Defendants

13  in order for them to gain significant profits from continued Bextra sales.

14          81.     Defendants' failure to conduct adequate testing and/or additional testing

15  prior to "market launch" was based upon their desire to generate maximum financial gains for

16  themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

17  inhibitor market.

18          82.     At the time Defendants manufactured, advertising, and distributed Bextra

19  to consumers, Defendants intentionally or recklessly ignored and/or withheld information

20  regarding the increased risks of hypertension, stroke and/or myocardial infarctions because

21  Defendants knew that if such increased risks were disclosed, consumers would not purchase

22  Bextra, but instead would purchase other cheaper and safer NSAID drugs.

23          83.     At all times relevant herein, Defendants engaged in a marketing campaign

24  with the intent that consumers would perceive Bextra as a better drug than its competitors and,

25  therefore, purchase Bextra.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
#### Negligence

84.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

85.    Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling Bextra. This duty included the duty not to introduce a pharmaceutical drug, such as Bextra, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

86.    At all relevant times to this action, Defendants owed a duty to properly warn Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug Bextra.

87.    Defendants breached their duties by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of Bextra, including:

a.    failing to use due care in the preparation and development of Bextra to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

b.    failing to use due care in the design of Bextra to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

c.    failing to conduct adequate pre-clinical testing and research to determine the safety of Bextra;

d.    failing to conduct adequate post-marketing surveillance and exposure studies to determine the safety of Bextra;

e.    failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff, consumers, the medical community, and the FDA;

1    f.    failing to accompany Bextra with proper warnings regarding all

2    possible adverse side effects associated with the use of Bextra;

3    g.    failing to use due care in the manufacture, inspection, and labeling

4    of Bextra to prevent the aforementioned risk of injuries to individuals who used Bextra;

5    h.    failing to use due care in the promotion of Bextra to prevent the

6    aforementioned risk of injuries to individuals when the drugs were ingested;

7    i.    failing to use due care in the sale and marketing of Bextra to

8    prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

9    j.    failing to use due care in the selling of Bextra to prevent the

10    aforementioned risk of injuries to individuals when the drugs were ingested;

11    k.    failing to provide adequate and accurate training and information to

12    the sales representatives who sold Bextra;

13    l.    failing to provide adequate and accurate training and information to

14    healthcare providers for the appropriate use of Bextra; and

15    m.    being otherwise reckless, careless and/or negligent.

16    88.    Despite the fact that Defendants knew or should have known that Bextra

17    caused unreasonable and dangerous side effects which many users would be unable to remedy by

18    any means, Defendants continued to promote and market Bextra to consumers, including

19    Plaintiff, when safer and more effective methods of pain relief were available.

20    89.    Defendants were, or should have been, had they exercised reasonable care,

21    in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

22    they continued to market their products by providing false and misleading information with

23    regard to the safety and efficacy of Bextra.

24    90.    Defendants knew or should have known that consumers such as Plaintiff

25    would foreseeably suffer injury as a result of their failure to exercise ordinary care as described

26    above.

27    91.    As a result of Defendants' actions, Plaintiff, and the Plaintiff's prescribing

28    physicians were unaware, and could not have reasonably known or have learned through

Bextra-MDL    - 21 -    COMPLAINT

1  reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

2  and that those risks were the direct and proximate result of Defendants' acts, omissions, and

3  misrepresentations.

4          92.    Defendants were, or should have been had they exercised reasonable care,

5  in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

6  they continued to market their products by providing false and misleading information with

7  regard to the safety and efficacy of Bextra.

8          93.    Defendants knew or should have known that consumers such as Plaintiff

9  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

10 above.

11         94.    As a direct and proximate consequence of Defendants' acts, omissions, and

12 misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

13 required and will require healthcare and services; has incurred and will continue to incur medical

14 and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

15 future; has suffered and will continue to suffer mental anguish, diminished capacity for the

16 enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

17 preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

18 direct medical losses and costs include care for hospitalization, physician care, monitoring,

19 treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

20         95.    Defendants' conduct was committed with knowing, conscious, wanton,

21 willful, and deliberate disregard for the value of human life and the rights and safety of

22 consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

23 as to punish Defendants and deter them from similar conduct in the future.

24         96.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

25 compensatory damages, and exemplary and punitive damages together with interest, the costs of

26 suit and attorneys' fees and such other and further relief as this Court deems just and proper.

27

28

Bextra-MDL                              - 22 -                                    COMPLAINT

**SECOND CLAIM FOR RELIEF:**
**Strict Liability – Defective Design and Failure to Warn**

97.    Plaintiff incorporates by reference all previous paragraphs of this

Complaint as if fully set forth herein and further alleged as follows:

98.    At all times relevant to this action, Defendants were suppliers of Bextra,

placing the drug into the stream of commerce. Bextra was expected to and did reach Plaintiff

without substantial change in the condition in which it was manufactured and sold.

99.    Bextra was unsafe for normal or reasonably anticipated use.

100.    Bextra was defective in design or formulation because when it left the

hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous

than an ordinary consumer would expect. Bextra was also defective and unreasonably dangerous

in that the foreseeable risk of injuries from Bextra exceeded the benefits associated with the

design and/or formulation of the product.

101.    At all times material hereto, Bextra was sold, marketed, distributed,

supplied, manufactured and/or promoted by the Defendant, in a defective and unreasonably

dangerous condition at the time it was placed in the stream of commerce in ways which include,

but are not limited to, one or more of the following particulars.

102.    When placed in the stream of commerce, the drug contained unreasonably

dangerous design defects and was not reasonably safe as intended to be used, subjecting

Plaintiff's Plaintiff to risks which exceeded the benefits of the drug:

a.    When placed in the stream of commerce, it was defective in design

and formulation, making use of the drug more dangerous than an ordinary consumer would

expect and more dangerous than other similar drugs;

b.    The drug was insufficiently tested;

c.    The drug caused harmful side effects which outweighed any

potential utility;

d.    The drug was not accompanied by adequate instructions and/or

warnings to fully apprize the consumers, including the Plaintiff, of the full nature or extent of the

Bextra-MDL                              - 23 -                              COMPLAINT

1  risks and side effects associated with use, thereby rendering Defendants liable to the Plaintiff and

2  Plaintiff, individually and collectively, pursuant to the Restatement (Second) of Torts, § 402A, as

3  adopted by the Named Plaintiff's Home District Courts.

4         103.    The drug was defective and unreasonably dangerous when it left the

5  possession of the Defendants in that it contained warnings insufficient to alert consumers,

6  including the Plaintiff, to the dangerous risks and reactions associated with the drug, including,

7  but not limited to, increased risk of cardiovascular events, and other serious and life threatening

8  side affects.

9         104.    The Plaintiff could not have discovered any defect in the drug through the

10  exercise of care.

11         105.    Defendants, as manufacturers of a prescription drug, are held to the level of

12  knowledge of an expert in the field.

13         106.    Bextra as manufactured and supplied by Defendants was also defective due

14  to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate

15  reporting regarding the results of the clinical trials, testing and study.  Defendants failed to

16  perform adequate testing before exposing Plaintiff to the medication, testing which would have

17  shown that Bextra had the potential to cause serious side effects including strokes like that which

18  affected Plaintiff.

19         107.    Bextra as manufactured and supplied by Defendants was defective due to

20  inadequate post-marketing warnings or instructions because, after Defendants knew or should

21  have known of the risk of injuries from Bextra, they failed to provide adequate warnings to the

22  medical community and the consumers, to whom they were directly marketing and advertising

23  Bextra; and, further, it continued to affirmatively promote Bextra as safe and effective.

24         108.    Bextra was manufactured, distributed, tested, sold, marketed, advertised

25  and promoted defectively by Defendants, and as a direct and proximate cause of Defendants'

26  defective design of Bextra, Plaintiff used Bextra rather than other safer and cheaper NSAIDs.  As

27  a result, Plaintiff suffered the personal injuries described above.

28

1    109.    Information given by Defendants to the medical community and to the
2  consumers concerning the safety and efficacy of Bextra, especially the information contained in
3  the advertising and promotional materials, did not accurately reflect the potential side effects of
4  Bextra.

5    110.    Defendants had a continuing duty to warn the Plaintiff of the dangers
6  associated with the drug.

7    111.    Had adequate warnings and instructions been provided, Plaintiff would not
8  have taken Bextra, and would not have been at risk of the harmful side effects described herein.

9    112.    Defendants acted with conscious and deliberate disregard of the
10  foreseeable harm caused by Bextra.

11    113.    Defendants were, or should have been had they exercised reasonable care,
12  in possession of evidence demonstrating that Bextra caused serious side effects.  Nevertheless,
13  they continued to market their products by providing false and misleading information with
14  regard to the safety and efficacy of Bextra.

15    114.    Defendants knew or should have known that consumers such as Plaintiff
16  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described
17  above.

18    115.    As a direct and proximate consequence of Defendants' acts, omissions, and
19  misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has
20  required and will require healthcare and services; has incurred and will continue to incur medical
21  and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the
22  future; has suffered and will continue to suffer mental anguish, diminished capacity for the
23  enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of
24  preexisting conditions and activation of latent conditions, and other such damages.  Plaintiff's
25  direct medical losses and costs include care for hospitalization, physician care, monitoring,
26  treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

27    116.    Defendants' conduct was committed with knowing, conscious, wanton,
28

1    willful, and deliberate disregard for the value of human life and the rights and safety of

2    consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

3    as to punish Defendants and deter them from similar conduct in the future.

4         117.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

5    compensatory damages, and exemplary and punitive damages together with interest, the costs of

6    suit and attorneys' fees and such other and further relief as this Court deems just and proper.

7                         **THIRD CLAIM FOR RELIEF:**
                         **Breach of Express Warranty**

8         118.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

9    as if fully set forth herein.

10         119.    Defendants expressly represented to Plaintiff and other consumers and the

11   medical community that Bextra was safe and fit for its intended purposes, that it was of

12   merchantable quality, that it did not produce any dangerous side effects, particularly any

13   unwarned-of side effects, and that it was adequately tested.

14         120.    These warranties came in the form of:

15              a.    Defendants' public written and verbal assurances of the safety and

16   efficacy of Bextra;

17              b.    Press releases, interviews and dissemination via the media of

18   promotional information, the sole purpose of which was to create an increased demand for

19   Bextra, which failed to warn of the risk of injuries inherent to the ingestion of Bextra, especially

20   to the long-term ingestion of Bextra;

21              c.    Verbal and written assurances made by Defendants regarding

22   Bextra and downplaying the risk of injuries associated with the drug;

23              d.    False and misleading written information, supplied by Defendants,

24   and published in the Physician's Desk Reference on an annual basis, upon which physicians

25   relied in prescribing Bextra during the period of Plaintiff's ingestion of Bextra, and;

26              e.    advertisements.

27

28

Bextra-MDL                         - 26 -                         COMPLAINT

1          121.    The documents referred to above were created by and at the direction of

2 Defendants.

3          122.    Defendants knew or had reason to know that Bextra did not conform to

4 these express representations in that Bextra is neither as safe nor as effective as represented, and

5 that Bextra produces serious adverse side effects.

6          123.    Bextra did not and does not conform to Defendants' express

7 representations because it is not safe, has numerous and serious side effects, including unwarned-

8 of side effects, and causes severe and permanent injuries.

9          124.    Plaintiff, other consumers, and the medical community relied upon

10 Defendants' express warranties.

11          125.    Defendants were, or should have been had they exercised reasonable care,

12 in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

13 they continued to market their products by providing false and misleading information with

14 regard to the safety and efficacy of Bextra.

15          126.    Defendants knew or should have known that consumers such as Plaintiff

16 would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

17 above.

18          127.    As a direct and proximate consequence of Defendants' acts, omissions, and

19 misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

20 required and will require healthcare and services; has incurred and will continue to incur medical

21 and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

22 future; has suffered and will continue to suffer mental anguish, diminished capacity for the

23 enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

24 preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

25 direct medical losses and costs include care for hospitalization, physician care, monitoring,

26 treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

27          128.    Defendants' conduct was committed with knowing, conscious, wanton,

28

1  willful, and deliberate disregard for the value of human life and the rights and safety of

2  consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

3  as to punish Defendants and deter them from similar conduct in the future.

4           129.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

5  compensatory damages, and exemplary and punitive damages together with interest, the costs of

6  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

7
### FOURTH CLAIM FOR RELIEF:
### Breach of Implied Warranty

8
9           130.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
as if fully set forth herein.

10
11           131.    Defendants manufactured, distributed, advertised, promoted, and sold
Bextra.

12
13           132.    At all relevant times, Defendants knew of the use for which Bextra was
intended and impliedly warranted the product to be of merchantable quality and safe and fit for

14  such use.

15
16           133.    Defendants were aware that consumers, including Plaintiff, would use
Bextra for treatment of pain and inflammation and for other purposes.

17
18           134.    Plaintiff and the medical community reasonably relied upon Defendants'
judgment and expertise to only sell them or allow them to prescribe Bextra only if it was indeed

19  of merchantable quality and safe and fit for its intended use. Consumers, including Plaintiff, and

20  the medical community, reasonably relied upon Defendants' implied warranty for Bextra.

21
22           135.    Bextra reached consumers, including Plaintiff, without substantial change
in the condition in which it was manufactured and sold by Defendants.

23
24           136.    Defendants breached their implied warranty to consumers, including
Plaintiff; Bextra was not of merchantable quality or safe and fit for its intended use.

25
26           137.    Defendants were, or should have been had they exercised reasonable care,
in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

27
28

1  they continued to market their products by providing false and misleading information with
2  regard to the safety and efficacy of Bextra.

3          138.    Defendants knew or should have known that consumers such as Plaintiff
4  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described
5  above.

6          139.    As a direct and proximate consequence of Defendants' acts, omissions, and
7  misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has
8  required and will require healthcare and services; has incurred and will continue to incur medical
9  and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the
10  future; has suffered and will continue to suffer mental anguish, diminished capacity for the
11  enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of
12  preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's
13  direct medical losses and costs include care for hospitalization, physician care, monitoring,
14  treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

15          140.    Defendants' conduct was committed with knowing, conscious, wanton,
16  willful, and deliberate disregard for the value of human life and the rights and safety of
17  consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so
18  as to punish Defendants and deter them from similar conduct in the future.

19          141.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks
20  compensatory damages, and exemplary and punitive damages together with interest, the costs of
21  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

22                          **FIFTH CLAIM FOR RELIEF:**
                            **Fraudulent Misrepresentation & Concealment**
23
24          142.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
   as if fully set forth herein.
25
26          143.    Defendants' superior knowledge and expertise, their relationship of trust
   and confidence with doctors and the public, their specific knowledge regarding the risks and
27
   dangers of Bextra, and their intentional dissemination of promotional and marketing information
28

Bextra-MDL                        - 29 -                              COMPLAINT

1    about Bextra for the purpose of maximizing its sales, each gave rise to the affirmative duty to

2    meaningfully disclose and provide all material information about Bextra's risks and harms to

3    doctors and consumers.

4              144.    Defendants made fraudulent affirmative misrepresentations with respect to

5    Bextra in the following particulars:

6                      a.      Defendants represented through their labeling, advertising,

7    marketing materials, detail persons, seminar presentations, publications, notice letters, and

8    regulatory submissions that Bextra had been tested and found to be safe and effective for the

9    treatment of pain and inflammation; and

10                     b.      Defendants represented that Bextra was safer than other alternative

11    medications.

12             145.    Defendants made affirmative misrepresentations; and fraudulently,

13    intentionally and/or recklessly concealed material adverse information regarding the safety and

14    effectiveness of Bextra.

15             146.    Defendants made these misrepresentations and actively concealed adverse

16    information at a time when Defendants knew or had reason to know that Bextra had defects and

17    was unreasonably dangerous and was not what Defendants had represented to the medical

18    community, the FDA and the consuming public, including Plaintiff.

19             147.    Defendants omitted, suppressed and/or concealed material facts concerning

20    the dangers and risk of injuries associated with the use of Bextra including, but not limited to, the

21    cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

22    purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

23    serious nature of the risks associated with the use of Bextra in order to increase its sales.

24             148.    The representations and concealment were undertaken by Defendants with

25    an intent that doctors and patients, including Plaintiff, rely upon them.

26             149.    Defendants' representations and concealments were undertaken with the

27    intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to

28    induce and encourage the sale of Bextra.

1    150.    Defendants' fraudulent representations evinced their callous, reckless,
2  willful, and depraved indifference to the health, safety, and welfare of consumers, including
3  Plaintiff.

4    151.    Plaintiff's physician and Plaintiff relied on and were induced by
5  Defendants' misrepresentations, omissions, and/or active concealment of the dangers of Bextra in
6  selecting Bextra treatment.

7    152.    Plaintiff and the treating medical community did not know that the
8  representations were false and were justified in relying upon Defendants' representations.

9    153.    Had Plaintiff been aware of the increased risk of side effects associated
10  with Bextra and the relative efficacy of Bextra compared with other readily available
11  medications, Plaintiff would not have taken Bextra.

12    154.    Defendants were, or should have been had they exercised reasonable care,
13  in possession of evidence demonstrating that Bextra caused serious side effects.  Nevertheless,
14  they continued to market their products by providing false and misleading information with
15  regard to the safety and efficacy of Bextra.

16    155.    Defendants knew or should have known that consumers such as Plaintiff
17  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described
18  above.

19    156.    As a direct and proximate consequence of Defendants' acts, omissions, and
20  misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has
21  required and will require healthcare and services; has incurred and will continue to incur medical
22  and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the
23  future; has suffered and will continue to suffer mental anguish, diminished capacity for the
24  enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of
25  preexisting conditions and activation of latent conditions, and other such damages.  Plaintiff's
26  direct medical losses and costs include care for hospitalization, physician care, monitoring,
27  treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

28    157.    Defendants' conduct was committed with knowing, conscious, wanton,

Bextra-MDL                    - 31 -                    COMPLAINT

willful, and deliberate disregard for the value of human life and the rights and safety of

consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

as to punish Defendants and deter them from similar conduct in the future.

158.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

compensatory damages, and exemplary and punitive damages together with interest, the costs of

suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)

159.    Plaintiff incorporates by reference all previous paragraphs of this

Complaint as if fully set forth herein.

160.    At all times relevant to this action, Defendants were the manufacturers,

sellers, and/or suppliers of Bextra.

161.    Plaintiff paid for Bextra for the purpose of managing pain safely and

effectively.

162.    Defendants have accepted payment from Plaintiff for the purchase of

Bextra.

163.    Plaintiff did not receive the safe and effective pharmaceutical product for

which Plaintiff paid.

164.    It is inequitable and unjust for Defendants to retain this money because the

Plaintiff did not in fact receive the product Defendant represented Bextra to be.

165.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court

deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1.    General damages in excess of the jurisdictional amount of this Court;

2.    Consequential damages;

Bextra-MDL                                    - 32 -                                    COMPLAINT

1                    3.     Disgorgement of profits;

2                    4.     Restitution;

3                    5.     Punitive and exemplary damages;

4                    6.     Pre-judgment and post-judgment interest as provided by law;

5                    7.     Recovery of Plaintiff's costs including, but not limited to, discretionary

6 Court costs of these causes, and those costs available under the law, as well as expert fees and

7 attorneys' fees and expenses, and costs of this action; and

8                    8.     Such other and further relief as the Court deems just and proper.

9

10 Dated: November 05, 2007          Respectfully submitted,

11

12 By: _____

13              B. KRISTIAN W. RASMUSSEN, III

14 B. Kristian W. Rasmussen, III, FL Bar No. 0229430
LEVIN, PAPANTONIO, THOMAS,
15   MITCHELL, ECHSNER & PROCTOR, P.A.
316 South Baylen Street, Suite 600 (32502)
16 P. O. Box 12308
Pensacola, Florida 32591
17 Telephone: (850) 435-7080
Facsimile: (850) 435-7020

18 Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28

1       **DEMAND FOR JURY TRIAL**

2       Plaintiff demands a trial by jury on all claims so triable in this action.

3       Dated: November 05, 2007          By:

4                                             B. KRISTIAN W. RASMUSSEN, III

5                                         B. Kristian W. Rasmussen, III, FL Bar No. 0229430
                                          LEVIN, PAPANTONIO, THOMAS,
6                                           MITCHELL, ECHSNER & PROCTOR, P.A.
                                          316 South Baylen Street, Suite 600 (32502)
7                                         P. O. Box 12308
                                          Pensacola, Florida 32591
8                                         Telephone:  (850) 435-7080
                                          Facsimile:  (850) 435-7020
9
                                          Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bextra-MDL                    - 34 -                         COMPLAINT